Hannelore **COOPER**, Respondent,

v.

**MEDICAL CENTER OF INDEPENDENCE,**
Appellant.

No. WD 52768.

Missouri Court of Appeals,
Western District.

Oct. 21, 1997.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Nov. 25, 1997.

John R. Fox, Fox, Stretz & Quinn, Kansas City, for appellant.

Robert H. Schnieders, Barton & Hall, Oak Grove, for respondent.

Before BRECKENRIDGE, P.J., and LAURA DENVIR STITH and HOWARD, JJ.

BRECKENRIDGE, Presiding Judge.

The Medical Center of Independence (MCI) appeals from a decision of the Labor and Industrial Relations Commission awarding temporary total disability benefits to its employee, Hannelore Cooper, for the period from April 26, 1994 through August 4, 1994. MCI contends that the Commission erred because during the period from April 5, 1994 through August 4, 1994, Ms. Cooper had been released to work and, under the criteria of § 287.020.7, RSMo 1994,[1] she was not totally disabled and not entitled to temporary total disability.

Ms. Cooper was employed by MCI as an obstetric technician at the time of her injury on August 25, 1993. As an obstetric technician, Ms. Cooper assisted the doctors in normal vaginal deliveries and caesarean sections, lifted patients out of beds and onto tables, and moved heavy equipment from room to room. At the time of her injury, Ms. Cooper was working in the labor and delivery unit of the hospital, assisting the staff with a caesarean section. Pursuant to instructions, Ms. Cooper attempted to lift a patient from a prostrate position on a caesarean section table into a sitting position so the staff could insert an epidural block in the patient's back. Ms. Cooper tried several times to lift the patient so her back would face the nurse anesthetist but was unable to do so. As she was trying to lift the patient up, Ms. Cooper felt what she thought was a pull or a snap, and had pain on the right side of her back that went down her hip and leg. At this point, Ms. Cooper informed the patient that she could not lift her, and she enlisted the assistance of the nurse anesthetist.

After finishing her shift, Ms. Cooper went home and told her husband that she thought she had injured her back at the hospital. She took Flexeril and aspirin, but neither medication did anything to relieve her pain

or improve her condition. Ms. Cooper worked another shift on August 26, 1993, although she continued to have back pain. After that shift, she had a couple of days off before her next shift. Her condition did not improve during those two days off work. Before her next shift, Ms. Cooper notified her nursing supervisor that she would not be able to come to work because of her back pain. The following day, Ms. Cooper scheduled an appointment with a chiropractor, who diagnosed her condition as a muscle strain or sprain, and treated it with hot, moist packs and electrical stimulation. The chiropractor also gave Ms. Cooper a work release slip for one week off work, with no lifting, pulling or pushing.

Following her appointment with the chiropractor, Ms. Cooper contacted MCI. She was told that she needed to come in, fill out an incident report, and go to the emergency room at MCI. Ms. Cooper went to the emergency room at MCI the next day. The emergency room physician told her to stay off work for the rest of the week, with no lifting, and advised her to consult another doctor of her choice if she had any more problems. Ms. Cooper consulted Dr. West. From September through October, 1993, Dr. West prescribed medication, physical therapy, and two epidurals. This course of treatment failed to relieve her pain. Dr. West then recommended surgery, and referred Ms. Cooper to Dr. Collins. Ms. Cooper saw Dr. Collins in November, 1993. Dr. Collins suggested an outpatient discectomy. Ms. Cooper did not undergo this procedure because the workers' compensation insurance carrier, Health Midwest, would not authorize it. Health Midwest referred her to Dr. Tackacs for a second opinion. Dr. Tackacs agreed with the diagnoses of Drs. West and Collins, and he advised her to remain off work, but he did not believe that surgery would be beneficial. Instead, Dr. Tackacs referred Ms. Cooper to Dr. Karges.

In January of 1994, Ms. Cooper consulted Dr. Karges. Dr. Karges diagnosed Ms. Cooper as having an acute lumbosacral strain. He advised her to remain off work, and

**1.** All statutory references are to the Revised Statutes of Missouri 1994.

prescribed a course of treatment involving medication, a preconditioning program, and a work hardening program. Ms. Cooper had follow-up appointments with Dr. Karges in February and March of 1994. On April 5, 1994, Dr. Karges recommended that Ms. Cooper resume work at the "light duty" level and issued a routine "return to work" statement. "Light duty" included restrictions on lifting, pushing and pulling which prohibited Mrs. Cooper from performing her duties as an obstetric technician. Ms. Cooper was restricted to lifting no more than thirty pounds from twelve inches to her waist, and no more than twenty pounds from her waist to overhead. Although he issued the "return to work" statement, Dr. Karges did not release Ms. Cooper from his care. According to Ms. Cooper, Dr. Karges advised her to continue to see him because he believed he might have more to offer her as far as her care.

Since Dr. Karges told Ms. Cooper she could return to work at light duty, Ms. Cooper contacted MCI and inquired as to whether they had a light duty position she could fill until she could return to her normal capacity. She was informed that MCI did not have a position with restrictions. On July 6, 1994, Ms. Cooper had a check-up with Dr. Karges, who determined that there was no change in her condition. Because her condition had not improved, Dr. Karges continued her on medication, performed trigger point injection therapy, and referred her for myofascial detriggering therapy and limbering exercises. Dr. Karges also issued another "return to work" statement, recommended that Ms. Cooper's work status stay the same, and indicated that she was to continue under his care. On July 19, 1994, Ms. Cooper had another follow-up appointment with Dr. Karges. Dr. Karges continued her on medication, recommended she use a TENS [2] unit, and advised that her work duty status should remain the same. Ms. Cooper contacted MCI after the July 6th and July 19th ap-

pointments to request light duty employment, but was told on both occasions that there was no job for her with restrictions.

Ms. Cooper had a final appointment with Dr. Karges on August 4, 1994. During this appointment, Dr. Karges decided that Ms. Cooper had reached maximum medical improvement. Dr. Karges made permanent the earlier job restrictions concerning lifting, and he released Ms. Cooper from his care. Ms. Cooper contacted MCI after her final appointment with Dr. Karges, and was informed again that there was no job for her with restrictions.

From April 5, 1994 through August 4, 1994, Ms. Cooper was an employee of MCI. She did not obtain employment elsewhere during that period. On February 11, 1995, approximately six months after Dr. Karges released her from his care, Ms. Cooper returned to work at MCI as a unit secretary on the surgical floor. Unit secretary is a clerical position that involves little to no lifting or physical work. She continues to work at the hospital in that position.

■ At the hearing before an administrative law judge of the Division of Workers' Compensation, the parties stipulated that on August 25, 1993, Ms. Cooper suffered an injury by accident arising out of and in the course of her employment at the hospital, and that the provisions of the workers' compensation law apply. The parties also stipulated that MCI had already paid Ms. Cooper $7,475.78 in temporary total disability benefits for the period of August 26, 1993 through April 25, 1994. The dispute was whether Ms. Cooper was entitled to temporary total disability benefits totaling $3,320.78 for the period of April 26, 1994 through August 4, 1994, when she was released to light work duty by Dr. Karges.[3]

The evidence presented at the hearing included Ms. Cooper's testimony, the deposition testimony of Dr. Karges, various medical

---

2. TENS is an acronym for transcutaneous electrical nerve stimulation. Dorland's Illustrated Medical Dictionary 1668 (28th ed.1994).

3. MCI argues in its brief that that no temporary total disability payments should have been paid after April 5, 1994. However, MCI did not make a claim before the ALJ or the Commission for

credit for benefits it paid from April 5, 1994 through April 25, 1994. Because it did not raise this issue before the Commission, MCI is precluded from raising this issue on appeal. Vinson v. Curators of Univ. of Missouri, 822 S.W.2d 504, 508 (Mo.App.1991).

records of the other treating physicians and several "return to work" slips. In his deposition testimony, Dr. Karges testified that when he first examined Ms. Cooper on January 18, 1994, he concluded that Ms. Cooper suffered from an acute lumbosacral strain that was not isolated anatomically. At the April 5, 1994 appointment, Dr. Karges instituted the lifting restrictions because her condition had not improved. However, Dr. Karges testified that he felt that Ms. Cooper could return to other gainful employment at that time if she functioned under the lifting restrictions. As of August 4, 1994, Dr. Karges believed that Ms. Cooper "had reached maximum medical improvement", and that they "had exhausted the routine medical interventions at that point." Dr. Karges testified that it was his opinion that Ms. Cooper has a "significant soft tissue injury with some dysfunction in the lumbar spine which will probably be chronic and will restrict her to the lifting range that [he] had stated."

The administrative law judge awarded Ms. Cooper temporary total disability benefits for the period from April 26, 1994 through August 4, 1994. In her findings, the ALJ acknowledged that an employer has no obligation to provide light duty employment to an employee under the Workers' Compensation Law. However, the ALJ found that if no light duty is made available to the employee, the employee is under active medical care, and there is a reasonable medical expectation that with treatment and time the employee's functional level will improve, the employer must provide temporary total disability benefits. The ALJ reasoned that it would be absurd to expect an employee such as Ms. Cooper to search for temporary employment in the open labor market when she is recovering from a work-related injury, under active medical care for the injury, and has a reasonable expectation that she will return to her former occupation. MCI appealed this decision to the Labor and Industrial Relations Commission. The Commission adopted the ALJ's decision granting Ms. Cooper benefits, with one member dissenting. This appeal ensued.

■ The issue is whether the Commission erred in finding that Ms. Cooper is entitled to temporary total disability payments from April 26, 1994 through August 4, 1994, during which time she was released to work with restrictions. In deciding an appeal of a workers' compensation claim, this court engages in a two-step review process:

In the first step, the court examines the whole record, viewing the evidence and all reasonable inferences drawn therefrom in the light most favorable to the award, to determine if the record contains sufficient competent and substantial evidence to support the award. If not, the Commission's award must be reversed. If there is competent and substantial evidence supporting the award, the court moves to the second step, where it views the evidence in the light most favorable to the award, but must consider all evidence in the record, including that which opposes or is unfavorable to the award, take account of the overall effect of all of the evidence, and determine whether the award is against the overwhelming weight of the evidence.

*Davis v. Research Medical Center*, 903 S.W.2d 557, 571 (Mo.App.1995).

■ In reviewing the Commission's award, the appellate court cannot substitute its judgment regarding questions of fact for that of the Commission. *Id.* Because, in this case, the Commission adopted the ALJ's findings and award, the "resulting consistency, especially as concerns credibility determinations, is a powerful factor in favor of upholding the Commission's award on appeal." *Id.* However, this court is not bound by those findings of the Commission that are clearly the interpretation or application of the law. *Id.*

■ The Workers' Compensation Law should be broadly interpreted in a liberal manner in favor of the employee. *Minnick v. South Metro Fire Protection Dist.*, 926 S.W.2d 906, 909 (Mo.App.1996). Questions regarding the right of the employee to benefits must be resolved in the injured employee's favor. *Id.* Additionally, the court should interpret a statute's meaning in such fashion as to "give effect to every section of the statute, and to extend benefits to the largest possible class of workers." *Id.* However, the claimant in a workers' compensation proceed-

ing has the burden of proving all elements of the claim to a reasonable probability. *White v. Henderson Implement Co.*, 879 S.W.2d 575, 577 (Mo.App.1994). Therefore, the burden was on Ms. Cooper to prove that she was entitled to temporary total disability benefits for the period from April 26, 1994 through August 4, 1994.

Section 287.020.7 defines "total disability" as the "inability to return to *any* employment and not merely [the] inability to return to the employment in which the employee was engaged at the time of the accident." "Temporary total disability" is a judicial creation that is defined by case law and not by statute. *See Herring v. Yellow Freight System, Inc.*, 914 S.W.2d 816, 820 (Mo.App.1995). The purpose of temporary disability awards is to cover the employee's healing period. *Id.* Temporary total disability benefits should be awarded only for the period before the employee can return to work. *Williams v. Pillsbury Co.*, 694 S.W.2d 488, 489 (Mo.App.1985). Temporary total disability awards are owed until the claimant can find employment or the condition has reached the point of maximum medical progress. *Vinson v. Curators of Univ. of Missouri*, 822 S.W.2d 504, 508 (Mo.App.1991). A temporary award is not warranted when further progress is not expected. *Phelps v. Jeff Wolk Const. Co.*, 803 S.W.2d 641, 646 (Mo. App.1991).

In determining whether an employee is totally disabled, the main issue is "whether any employer, in the usual course of business, would reasonably be expected to employ the [employee] in [the employee's] present physical condition." *Brookman v. Henry Transp.*, 924 S.W.2d 286, 290 (Mo. App.1996). This standard is applied to temporary total disability, as well as permanent total disability. Contrary to the findings of the Commission, this does not mean that an employer is forced to either make light duty available to a claimant or pay temporary total disability benefits simply because the claimant remains under active medical care and there is a reasonable expectation that the employee's functional level might improve. An employer is only obligated for

said benefits if the employee could not compete on the open market for employment.

On the other hand, we also reject MCI's suggestion that the only issue in determining whether this standard is met is whether the claimant was physically able to perform any type of work, and that if the claimant can do so, then temporary total disability is unavailable. The ability to perform some work is not the test for temporary total disability. Rather, as just noted, the test is whether the employee is able to compete in the open labor market given the employee's present physical condition. *Id.* Certainly the ability to perform some work is relevant to this determination, but it is not dispositive. To the contrary, a number of cases have recognized that a claimant can be totally disabled even if able to perform sporadic or light duty work. As we recently stated in *Minnick*, 926 S.W.2d at 910:

> Cases in this area specifically state that neither the worker's ability to engage in occasional or light duty work nor the worker's good fortune in obtaining work other than through competition on the open labor market should disqualify the worker from receiving ... total disability benefits under Workers' Compensation Law. *See e.g.*, *Gordon v. Tri–State Motor Transit Co.*, 908 S.W.2d 849 (Mo.App.1995) (claimant who did household repair work, lawnmowing, and automotive repair was entitled to total disability benefits because he did such activities at his own pace and with the assistance of others); *Brookman v. Henry Transportation*, 924 S.W.2d 286 (Mo.App. E.D.1996) (mechanic who was not capable of doing his normal job nor competing on open job market but who was released to do light work after falling from ladder and whose condition was expected to improve was entitled to temporary total benefits, despite fact that, because of economic necessity, claimant swept floors for two weeks, did remodelling work for four weeks and worked as a telemarketer for three weeks).

*Id.* (footnote omitted).

Therefore, the fact that a claimant was capable of, but did not seek, sporadic or light duty work, would not in itself dis-

qualify the claimant from receiving temporary total disability benefits. A nonexclusive list of other factors relevant to a claimant's employability on the open market includes the anticipated length of time until the claimant's condition has reached the point of maximum medical progress, the nature of the continuing course of treatment, and whether there is a reasonable expectation that the claimant will return to the claimant's former employment.

Viewing the evidence in the light most favorable to the award, the evidence supports the Commission's finding that Ms. Cooper was entitled to temporary total disability benefits from April 26, 1994 through August 4, 1994. During this time, Ms. Cooper remained under Dr. Karges' care. Although Dr. Karges cleared Ms. Cooper for light duty work on April 5, 1994, she had restrictions on the amount she could lift to her waist and over her head, which prevented her from returning to her job as an obstetric technician. Dr. Karges continued to devise a treatment plan for her that included pain medication, antidepressants and various methods of therapy and exercise. The specific relevant facts found by the ALJ, and adopted by the Commission, are as follows:

> When the claimant saw Dr. Karges on April 5, 1994, he referred her for a follow up rheumatological evaluation. It was Dr. Karges' opinion that if she had an underlying connective tissue disorder or rheumatological problem, her prognosis for gaining more function would not be good.... Although Dr. Karges indicated in April of 1994 that treatment modalities were limited at this point in time, he still wanted to try specific trigger point injections with anesthetic only if the rheumatological evaluation was normal.... The rheumatological evaluation was done after April 5, 1994, and showed no abnormalities. During the July 6, 1994, visit, Dr. Karges and the patient elected to proceed with a trial of trigger point injection therapy, and one trigger point injection was given on July 6, 1994. Dr. Karges ordered that the claimant have three sessions of myofascial de-triggering therapy and limbering exercises and kept her on medication. He made a follow-up appointment for her at the completion of her physical therapy.... When the claimant returned for a follow-up visit on July 19, 1994, Dr. Karges found no positive response to the trigger point injections and, therefore, did not continue that modality of treatment. He was concerned at this point that they were dealing with a "chronic soft tissue pain problem" and recommended a TENS unit. He also continued the anti-inflammatory and antidepressant medication. The claimant was instructed to return for a follow-up visit on August 4. The claimant did indicate upon her return visit on the [sic] August 4, 1994, that she had some temporary improvement with her pain immediately following short usages of the TENS unit. Her physical exam, however, was much the same as it had been. It was Dr. Karges' opinion at that time, on August 4, 1994, that the claimant had reached the maximum medical improvement and that they "had exhausted the routine medical interventions at that point."

(References to exhibits omitted). As is evident, Ms. Cooper was actively involved in an evolving course of treatment with Dr. Karges and needed to be available for appointments with Dr. Karges and for therapy. Further, Ms. Cooper remained employed by MCI with an intention of returning to work there.

The question is whether, from this evidence, it was reasonable to infer that no employer would have been reasonably expected to hire Ms. Cooper under the circumstances which existed from April 26, 1994, through August 4, 1994. Although the evidence is purely circumstantial, "the existence of only circumstantial evidence on a material issue is no bar to recovery of and by itself." *Vaughn v. Taft Broadcasting Co.,* 708 S.W.2d 656, 661 (Mo. banc 1986). But, "[t]he circumstantial evidence must establish the desired inference with such certainty as to cause it to be the more reasonable and probable of the conclusions to be drawn." *Id.*

A significant fact in judging the reasonableness of the inference that a claimant would not be hired is the anticipated length of time until the claimant's condition has reached the point of maximum medical prog-

ress. If the period is very short, then it would always be reasonable to infer that a claimant could not compete on the open market. If the period is quite long, then it would never be reasonable to make such an inference. Here, the period of three to four months is within the middle ground, where the decision involves the exercise of discretion.[4] This court finds that, under the evidence, it was not an abuse of discretion for the Commission to find that it was reasonable and probable that Ms. Cooper was unable to obtain temporary employment on the open labor market when she was under duty restrictions, recuperating from a work-related injury, under active medical treatment, and had the intention to return to her former occupation. With this inference, there was substantial evidence to support the Commission's finding that Ms. Cooper was entitled to temporary total disability benefits.

 Having found that there is competent and substantial evidence to support the award, the second step in the review is to consider all the evidence in the record, including that which is unfavorable to the award, to determine whether the award is against the overwhelming weight of the evidence. *Davis*, 903 S.W.2d at 557. MCI's argument under the first step of the review under *Davis* was based on its claimed lack of evidence that Ms. Cooper was unable to any employment elsewhere. Its argument under the second step of the review is very similar. MCI asserts that even though Ms. Cooper may have reached the point of maximum medical progress on August 4, 1994, Dr. Karges released her to light duty work on April 5, 1994. Although MCI did not have any light duty work available for Ms. Cooper during this period, it did not have a duty to provide her with light duty work. Thus, MCI contends that because § 287.020.7 defines "total disability" as the inability to return to *any* employment, and there was no evidence that Ms. Cooper tried to obtain light duty work elsewhere, she is not entitled to temporary total disability benefits.

In our resolution of the first prong of the *Davis* test, we found that there was substantial evidence, albeit circumstantial, to support the Commission's award. Here, when we consider all the evidence in the record, we find there is no overwhelming evidence which would compel a contrary result. The fact that Dr. Karges cleared Ms. Cooper for light duty work during the period in question does not overwhelmingly outweigh the evidence supporting the finding that she was entitled to temporary total disability benefits. Ms. Cooper had restrictions on the amount she could lift, she was actively undergoing medical treatment in which further progress was expected, and she had every intention of returning to her job at MCI as an obstetric technician. There is a reasonable inference from this evidence that no employer would have been reasonably expected to hire her and, thus, she was unable to compete in the open job market. Because the Commission's award was supported by substantial and competent evidence, and was not against the overwhelming weight of the evidence, its decision granting Ms. Cooper temporary total disability benefits for the period from April 26, 1994 through August 4, 1994 is affirmed.

All concur.

---

4. An employee would be wise to avoid dependence upon an inference by presenting evidence of the employee's efforts to obtain employment when released to light duty or expert testimony concerning the likelihood of obtaining employment on the open labor market under the employee's circumstances.